# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER  09-0204** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CHERYL CAROTHERS MARTIN** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 19] filed by defendant, Cheryl Carothers Martin.  For reasons stated below, it is recommended that the motion be **GRANTED.**

On August 6, 2009, Trooper First Class Michael Linton ("Trooper Linton" or "Linton") of the Louisiana State Police stopped Cheryl Carothers Martin ("Martin") for a traffic violation on Interstate 20 in Ouachita Parish, Louisiana.  Pursuant to the stop, the Louisiana State Police ultimately uncovered over 25 pounds of cocaine located inside of a hidden compartment in Martin's car.  On August 27, 2009, a federal grand jury returned an indictment against Martin for her alleged knowing and intentional possession with intent to distribute five kilograms or more of cocaine powder in violation of 21 U.S.C. § 841(a)(1).  On October 16, 2009, Martin, via counsel, filed the instant motion to suppress the physical evidence that was found in her car and on her person.  Following a delay for briefing and an evidentiary hearing held on November 19, 2009, the matter is now before the court.

## Background

The following evidence was adduced at the November 19, 2009, hearing held in this

matter.[1]  On August 6, 2009, at approximately 1:45 p.m.,Trooper Linton[2] observed a 2001 white

Pontiac Aztec, with an obscured license plate, eastbound on I-20, near mile marker 101 in

Ouachita Parish.[3]  Specifically, the license plate trim ring obscured the name of the issuing state

in violation of Louisiana Revised Statute 47:507.[4]  Accordingly, Trooper Linton initiated a traffic

stop of the Aztec.[5]  Due to the traffic, as per his custom, Trooper Linton approached the Aztec on

the passenger side.  Linton observed that the sole occupant was a female driver, later identified as

Cheryl Martin.

At the passenger side window, Trooper Linton exchanged greetings with Martin who

inquired about the purpose of the stop.  In response, Linton asked Martin whether she had her

license.  He added that he would explain the purpose of the stop after he received her paperwork.

---

[1]  The facts are largely, if not entirely, uncontested.  The only witnesses who testified were three law enforcement officers for the government.  Their testimony was generally consistent with the video dvd of the stop which defendant introduced into evidence.  (Def. Exh. 1).  To the extent that the witnesses' testimony conflicted with the dvd video, the court defers to the video.

[2]  Trooper Linton has been employed as a Louisiana State Trooper for eight years; he served the last three years in the Criminal Patrol Unit.  During his career, Trooper Linton has been involved in approximately 50 narcotics-related arrests, including two vehicle seizures that contained hidden drug compartments.  Over the years, he has attended various conferences on drug interdiction and trafficking.

[3]  At the time of the stop, Trooper Linton was working the area with two other state police officers in the criminal patrol section, Master Trooper Bruce Robinson and Trooper First Class Jason Hanneman.  The purpose of the criminal patrol section is to interdict any type of criminal activity.

[4]  The government introduced a photograph of the license plate and trim ring which reveals that the name of the issuing state, North Carolina, was almost completely obscured by the ring and illegible from a distance.  (Gov.'t Exh. 1).  Linton testified at the hearing that he tries to stop every car that has an obscured license plate.

[5]  Prior to the stop, Linton acknowledged that he had no suspicions of Martin being involved in any type of illegal activity.

Upon receiving Martin's driver's license, Linton asked whether her address was correct.  He then proceeded to explain that he stopped her because her license plate ring obscured the issuing state. Martin stated that she had not known that this was illegal, and asked if Linton wanted her to remove the ring.  Linton stated that Martin could remove the ring at the next exit.  Linton then inquired whether Martin had ever received any tickets "or anything."  Martin replied, "no," but then discussed a speeding ticket.  Linton inquired whether Martin had ever been arrested, which she denied.  Linton then asked Martin where she was coming from.  She replied, Bryan, Texas, where she had bought herself a hat.  Linton asked her what she was doing down there.  Martin replied that she was visiting friends.  Linton followed up by asking if she had been down there for a couple of days.  Martin said she had gone down for a little vacation, and confirmed that she had been down there for a couple of days.  Linton then asked whether Martin stayed with her friends or at a hotel.  Martin said that she stayed one night at a hotel and two nights with her friends.  Linton asked Martin how long she had known these friends.  Martin's response was inaudible on the video.  Linton then inquired whether Martin had a good job that would let her go on this trip.  Martin replied that she was a landscaper and suggested that her work schedule was flexible.[6]  At this point, Linton stated, "let me go check your information," and returned to his unit.[7]

Once back in his car, Trooper Linton expressed to himself, out loud, that he disbelieved

---

[6]  At the hearing, Linton stated that the purpose of his questioning was to determine whether Martin was engaged in any criminal activity.  Linton acknowledged that Martin fully cooperated with all of his requests.

[7]  Linton returned to his car 2:40 into the video which started recording approximately 26 seconds before the cars rolled to a stop.  Unless otherwise stated, the court's time references will indicate the time on the dvd, which in turn, must be reduced by 26 seconds to obtain the elapsed time from the stop.

plaintiff's story.  He contemporaneously recorded his suspicions as follows, 1) Martin visited friends that she had only known for a little while – stayed in a hotel one night and then with her friends for two nights;[8] 2) she is VERY friendly; 3) she denies any criminal history; and 4) "something's not right with her."[9]  At the hearing, Trooper Linton further explained that Martin seemed too eager to remedy the traffic violation so she could be on her way.[10]  He also thought it was odd that she grabbed her hat and shook her head up and down to demonstrate that she had bought a hat, in an exaggerated effort to prove that she had gone shopping in Houston.  Linton added that it was odd that she had a sleeping bag in her car if she stayed in a hotel and with her friends.  He remarked that she only had one small bag, which seemed incapable of holding more than a single change of clothes and a pair of shoes, that was supposed to last her for three days.[11]  He also did not see any shopping bags, despite her claim to have gone shopping.

Linton proceeded to run Martin's name and registration on the ThinkStream and MobileCop systems available to him in the car.  The searches came back negative.  Linton testified, however, that these searches were not definitive, because despite the negative results, he sometimes obtained a hit when the name was run through the office system.  Accordingly, at 4:31 on the video, Linton called in Martin's name to dispatch.  While this search was pending, Linton

---

[8]  Linton later explained that he did not know anyone who would make a friend that he or she had not seen in awhile stay in a hotel.

[9]  Linton later remarked that she had "one little bitty bag of clothes."

[10]  On cross-examination, Linton stated that he had been involved in numerous traffic stops, with the same circumstances, which had all turned out the same way.

[11]  Linton explained that based on his experience, women travel with larger bags, or at least two.

began writing a warning ticket for the license plate violation.[12]   At 8:20, dispatch notified Linton

that there was "no record for [his] subject."   Linton then used Microsoft's *Trips and Streets*

program on his laptop to determine whether Martin was taking the correct route between Bryan,

Texas and North Carolina.   Also during this period, Linton searched Martin's name using her

birth name, Carothers.   At approximately 9:50, the mapping program revealed that the distance

between North Carolina and Bryan, Texas was 1,100 miles.   Linton then began to fill out a

consent to search form.   At 12:30, Linton requested backup from Master Trooper Bruce

Robinson.   At 13:10, Linton exited his car and re-approached Martin's car.[13]   By this point, he

had already decided to seek Martin's consent to search the car.

      Leaning inside the open window of the passenger-side door, Trooper Linton asked Martin

at 13:20 whether she had gotten a lot of rain.   He then asked Martin how long she had been

knowing those folks, and how she had met them.   Linton also asked whether all of Martin's

family lives in North Carolina.   At 13:51, Trooper Linton informed Martin that he was going to

give her a warning.   Linton explained that Martin did not need to return to his office, and that she

could remedy the trim ring issue on her own.   At 14:30, as Linton was tearing off the paperwork,

he asked Martin, "what did y'all do when you were down there?"   He followed up with "y'all

went into Houston to shop?" and then "how far is it from Bryan down there?"[14]   At 14:46, Linton

handed Martin her paperwork (license, registration, and insurance) while still questioning her.

At 14:50, Linton asked, "well look do you mind talking with me?   Can I talk to you some more?"

---

      [12]  Linton had completed the warning ticket by the time dispatch returned the search
results.

      [13]  Linton testified that according to his training a traffic stop should take 10 minutes from
contact until "clear."

      [14]  During this period of questioning, Linton was still fumbling with paperwork.

Martin enthusiastically assented.

Accordingly at 14:56, Linton told Martin that "out here on the highway we deal with good people, bad people, all kinds of things."  Martin then interjected with concerns about the passing traffic.  At 15:11, Linton asked, "well look, you don't have anything illegal, weapons, any kind of contraband, marijuana, cocaine?  Meth?  I didn't ask if you do them.  . . . Would you have a problem with me searching your vehicle?"  Martin said something inaudible before Linton again asked "would it be a problem with me searching your car?"  Martin replied something to the effect that the request made her feel "so weird," and why would he want to do that.  Linton responded at 15:31, "part of my job.  I don't ask everybody I stop.  I ask certain people, and I chose to ask you.  Is there a problem with that? . . . okay before you say yes, or no, I want you to read this."  Linton then handed Martin the completed consent form for her to review.

Linton testified that Martin verbally gave her consent to search.[15]  Meanwhile, Master Trooper Robinson arrived on scene at 15:42.  Linton explained the top half of the consent to search form to Martin and stated that by signing the form Martin was allowing him to search the car.  However, Trooper Linton did not recite or explain the last sentence of the form which provides that "no promise, threat, or coercion of any kind has been made against me by the Louisiana Office of State Police and *I have been informed by the above named State Police officer that I may refuse to consent to any search and that I may revoke my consent to search at any time.*"  (Gov't Exh. 2) (emphasis added).[16]  At no time, did Linton tell Martin that she was free to leave.

---

[15]  At the hearing, Linton candidly admitted that if Martin had refused to consent to the search, he would have contacted a K-9 unit.

[16]  The consent form is a standard form used by the Louisiana Department of Public Safety and Corrections, Office of State Police.

At 16:05, Linton told Martin that if she wants to, she "can come back here with [Linton]
and read it back here."  Once Martin exited the car (with some difficulty) to the passenger side,
Linton told her at 16:52 that he wanted her to read the consent form first.  Martin read the form
for approximately six seconds, and then signed it.  Linton then asked Martin if she had anything
on her and whether he needed to have a female officer come out there.  Martin, who was wearing
a loose fitting pair of shorts and a t-shirt, tugged on her clothes to show that she was not
concealing anything.  Nonetheless, Linton told her to pull out and shake the bottom of her
brassiere through her clothing.

At 17:56, as Linton began his search of the Aztec, he told Master Trooper Robinson to
watch Martin to make sure that she did not drop anything.[17]  Robinson testified that Martin
appeared really nervous, and that she had her hands under her shirt.  He told her to take her hands
out from under her shirt.  When she did so, a small bag of marijuana came out.[18]  At 18:46,
Robinson told Linton that Martin had marijuana on her.  Robinson then joined in the search of
the car.

Linton began his search, as a matter of routine, from the right, front side of the car and
worked his way clockwise around the car.  Linton searched Martin's bag and located a small
amount of marijuana and half of a valium pill in an unmarked bottle.  At 22:01, Linton looked
underneath the car and observed that the heat shield was held by rivets, which he knew to be
improper.  Linton continued with the search and discovered that the molding on the floor was
partially raised on the right side which indicated to him that someone had previously removed it.

---

[17]  Martin testified that based upon Martin's demeanor, he felt that she either had
something on her, or it was in the vehicle.

[18]  Robinson's interaction with Martin does not appear on camera.

He further noticed that the cargo fasteners in the cargo area were "heavily tooled or scratched" and were not flush with the floor.  After seeing that, Linton began to think that there was some type of compartment under the vehicle.

At 24:59, Linton asked Martin to open the vehicle's hatchback.  Martin so complied.  At 25:15, Linton looked under the rear of the vehicle and observed that the spare tire was clean, but had fingerprints on the rim.  Also, there was black, non-uniform undercoating ahead of the tire that looked out of place.  Accordingly, at 26:25, Linton radioed Trooper Hanneman to bring a density meter to the scene.[19]  At 31:38, Trooper Hanneman arrived with the meter.  Linton used the meter to check the tire and the cargo floor, but the results were negative.  The search continued.

At 44:03, Trooper Linton advised Martin that they may have found a compartment, and that if she knew anything about it, the best policy was honesty.  In response to further questioning, Martin stated that she had owned the car for less than one year, and that no one had taken the car while she was in Texas.  Trooper Linton explained to Martin that her behavior had caused these events, and remarked that he was pretty good at reading people.  At 46:14, Linton told Martin that technically, he could arrest her with what he had, but his intention was to just write her a ticket.  Linton added, "what we're going to do is to go to my office which is further down the road.[20]  One unit is going to be ahead of you; one unit is going to be behind you. . . . If there's nothing else, you'll be on your way."  The cars departed the scene at 49:36.[21]

---

[19]  As the name suggests, a density meter measures the density of objects.

[20]  Linton acknowledged at the hearing that Martin was being detained because of the marijuana.

[21]  The video ends less than one minute later.

8

At headquarters, the troopers placed the Aztec on a car lift and continued the search. They noticed several more apparent alterations to the bottom of the vehicle, which ultimately led to the discovery of a compartment hidden under the floor of the second seat row.  Inside of the compartment, they discovered 10 and ½ packages of what was later determined to be 25.4 pounds of cocaine.  *See* Gov.'t Exh. 3.  Martin was formally placed under arrest.

## Law and Analysis

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., Amend. IV.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied."  *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal quotation marks omitted).  A traffic stop entails a seizure for purposes of the Fourth Amendment.  *Id.*; *see also, United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (stopping a vehicle and detaining its occupant(s) constitutes a seizure).  Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. *Brigham, supra*.  (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime."  *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)).  Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity."  *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)).  To satisfy the Fourth Amendment, the

stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)).  The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence."  *Id*. (citation omitted).  The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*.  (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered:  (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.  *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).  Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted).   However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid.  *Id*.

## I.  *Terry's* First Prong

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

In this case, Trooper Linton initially stopped Martin because her license plate was partially obscured in violation of Louisiana Revised Statute 47:507, which provides that

> B. Every permanent registration license plate shall at all times be securely
> fastened to the vehicle to which it is assigned, so as to prevent the plate from
> swinging, and at a height not less than twelve inches from the ground, measuring
> from the bottom of such plate, in a place and position to be clearly visible, **and
> shall be maintained free from foreign materials and in a condition to be
> clearly legible.**

La. R. S. 47:507(B) (emphasis added).

The evidence uniformly establishes that Martin's vehicle had a license plate holder which

obscured the plate's issuing state.  This trim ring constitutes a "foreign material" which rendered

a key portion of the license plate illegible.  *See United States v. Contreras-Trevino*,  448 F.3d

821, 823 (5th Cir. 2006) (finding probable cause to stop car when plate was partially obscured by

plate holder in violation of a more detailed Texas statute).  Accordingly, Linton had reasonable

suspicion to initially stop Martin's vehicle.

## II.    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's

actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his
> reasonable suspicion developed during the stop.  This is because a detention must
> be temporary and last no longer than is necessary to effectuate the purpose of the
> stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer

may (1) examine the driver's license and registration of the driver and vehicle, and run a

computer check to investigate whether the driver has any outstanding warrants and if the vehicle

was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about

the purpose and itinerary of their trip, including other unrelated questions.  *See generally*

*Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*,

11

993 F.2d at 437.[22]  Detention during these actions is reasonable under the Fourth Amendment.

"Although an officer's inquiry may be wide-ranging, once all relevant computer checks have

come back clean, there is no more reasonable suspicion, and, as a general matter, continued

questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at

431. (citations omitted).  "[T]o continue a detention after such a point, the officer must have a

reasonable suspicion supported by articulable facts that a crime has been or is being committed."

*United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (citation omitted).[23]

In this case, Trooper Linton's initial questioning of Martin (before he ran the computer

checks) was fully within the scope of the initial traffic stop.  As cited above, the Fifth Circuit has

repeatedly held that pursuant to a valid stop, a police officer may request the driver's license and

registration, run a license and criminal background check, and question the driver regarding her

origin and itinerary.  *See Dortch, supra* (detention and questioning while computer check was

pending was lawful).  However, to extend the detention once the computer background checks

came back negative, Linton needed to articulate specific facts which support a reasonable

suspicion of additional criminal activity.

As set forth above, Linton identified the following facts to support his belief that Martin

was involved in wrongdoing, 1) Martin visited friends that she had known but for a short period,

_____

[22]  "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'"  *Lopez-Moreno*, 420 F.3d at 431.

[23]  "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed."  *Lopez-Moreno*, 420 F.3d at 431. (citations omitted)

and stayed in a hotel one night and then with her friends for two nights; 2) she was very friendly; 3) she denied any criminal history; 4) "something [was] not right with her;" 5) she had one small bag of clothes; 6) she was too eager to remedy the traffic violation so she could be on her way; 7) she oddly demonstrated that she had bought a hat; 8) she had a sleeping bag in her car despite staying in a hotel and with friends; 9) she had no shopping bags despite her claim to have gone shopping; and 10) she was making an 1,100 mile trip (each way) to visit friends for a few days. On the other hand, the court observes that Martin was traveling at a non-suspicious time of day -- the afternoon. *See United States v. Villalobos*, 161 F.3d 285, 289 (5th Cir.1998)(time of day that vehicle is traveling is a relevant consideration). Furthermore, Linton's map search confirmed that Martin took the most expeditious route between Bryan, Texas and North Carolina.

Most all of the alleged grounds articulated by Linton to support his suspicions are susceptible to innocent explanation.[24] The Supreme Court has recognized, however, that even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion. *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1587 (citations omitted); *but c.f. Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752 (1980) (court discounted several facts articulated by the officer because the facts potentially applied to a very large category of presumably innocent travelers).[25] Moreover, in considering whether the detaining officer has a

---

[24] For instance, Martin may have stayed in a hotel the first night because she arrived at her destination too late to go to her friend's house. She may have brought a small bag of clothes with the intention of washing her clothes at her friends' house. She also may have used the sleeping bag to sleep at her friends' house. If, as she stated, her shopping trip only netted a hat, it stands to reason that she would not have had any shopping bags.

[25] In *Reid*, the Court held that the remaining consideration – the agent's belief that the defendant and his companion were attempting to conceal the fact that they were traveling together – was more an "inchoate and unparticularized suspicion or 'hunch,'as opposed to a "fair

"particularized and objective basis" for suspecting legal wrongdoing, the court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 751 (2002) (citations omitted).  Nonetheless, the vast majority of Trooper Linton's suspicions focused upon circumstances that could have been allayed by asking follow-up questions.

In *United States v. Jenson*, the Fifth Circuit discounted inconsistent statements by car passengers used as a basis to support an officer's reasonable suspicion, where the officer could have dispelled his suspicions simply by asking follow-up questions.  *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006).[26]  Here, the only circumstance that was not readily amenable to explanation by Martin was Linton's perception that Martin appeared too friendly and eager to remedy the traffic violation so she could be on her way.  Linton testified that he had experienced numerous traffic stops with the same type of situation which all "turned out the same way."[27] However, an officer's belief that a detainee wants to "get out of there" does "'not amount to an 'articulable suspicion that a person has committed or is about to commit a crime,' as opposed to a mere hunch.'"  *United States v. Thibodeaux*, 276 Fed. Appx. 372, *6 (5th Cir. Apr. 24, 2008) (unpubl.).

---

inference in the light of his experience."  *Reid, supra*.

[26]  The court cited *Florida v. Royer* for the proposition that an officer should use "'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'"  *Id*. (quoting  *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983)).

[27]  Linton acknowledged that although he had experienced some situations where drugs were not involved, the detainees had criminal histories which gave them a reason to be nervous.

14

The courts are generally obliged to accord deference and even "great respect" to an officer's training and experience.  *See Jenson*, 462 F.3d at 405.  However, the courts are not compelled to rubberstamp an officer's proffered rationale simply because he invokes his training and experience.  Indeed, in *Jenson*, the Fifth Circuit discounted the officer's observation that it was unusual for a vehicle not to brake and pull over as soon as the officer activated his emergency lights.  *Jenson, supra*.  Rather, the court conjectured alternative, benign explanations for the vehicle's delay in pulling over.  *Id*.  Similarly, here, Martin's perceived over-eagerness and friendliness could be attributed to an engaging and accommodating personality.

As in *Jenson*, the facts articulated by Trooper Linton are less substantial than arguably more incriminating circumstances found wanting in other Fifth Circuit cases.  *See Jenson, supra*; *Dortch, supra* (conflicting stories from the driver and passenger concerning their point of origin, neither driver nor passenger were listed as authorized drivers on the rental agreement, and the driver's nervousness, did not give rise to a reasonable suspicion of drug trafficking); *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000) (discrepancies between the driver and passenger's explanations about their destination and the nature of their business, the fact that the car had been rented by the driver's mother but neither he nor the passenger were listed as authorized drivers, and the driver's admission that he previously had been arrested for crack cocaine possession, did not establish reasonable suspicion of criminal activity; *Santiago, supra*, (nervousness and conflicting statements by vehicle occupants did not provide reasonable suspicion); *Thibodeaux, supra* (no reasonable suspicion where defendant:  left his car door open; was hesitant to approach officer; tried to return to car; appeared jittery; initially refused to comply with request to sit in back of car; and collapsed emotionally on the ground); *United States v. Jackson*, 517 F. Supp. 2d

15

859, 878 (W. D. La. 2007) (Stagg, J., Hornsby, M.J.) (nervousness, criminal history, and unusual travel story did not provide reasonable suspicion).

Perhaps of even greater importance is Linton's failure to explain a link between Martin's purportedly suspicious behavior and any specific criminal activity. *Jenson*, 462 F.3d at 405; *Thibodeaux, supra*. Linton testified that based upon all of the facts that he identified, he believed that Martin was up to no good and that "something [was] wrong." Linton later reiterated that he had determined that "something was wrong"and that he was going to search her vehicle. Linton, however, did not articulate how Martin's behavior and the remaining circumstances indicate that she was engaged in illegal drug activity or some other specific criminal activity. *See Jenson, supra*; *see also Santiago, supra* (search was unreasonable even though officer thought that the car might contain drugs, because any suspicion of drug trafficking was dispelled once the licenses cleared).[28]  Accordingly, Linton's suspicions comprised no more than a hunch, albeit a very good one. *Jenson, supra; Thibodeaux, supra*. Hunches, however, do not suffice.

Although it is admittedly a close question, upon consideration of the totality of circumstances, the undersigned is compelled to find that the government has not demonstrated a

---

[28]  Although Martin was traveling on a known drug corridor, I-20 (as was the defendant in *Jenson*), Trooper Linton did not identify this consideration as a motivating factor behind his suspicion. *See United States v. Jackson*, 517 F. Supp. 2d 859, 878 (W. D. La. 2007) (Stagg, J., Hornsby, M.J.) (stopping officer failed to articulate any characteristics of car or area where car was stopped (I-20) to indicate that defendant was engaged in drug or criminal activity); *compare United States v. Reyes*, 2009 WL 792231 (W.D. La. Mar. 25, 2009) (trooper had reasonable suspicion where, *inter alia*, he relied upon fact that defendant was transiting between cities known to be involved in the drug trade).

In this case, Linton testified that he has experienced similar situations which all "turned out the same way."  It is not clear, however, whether the "same way" means criminal activity in general, or the illegal drug trade, in particular.  Linton also did not explain how the observed circumstances specifically correlate with the illicit drug trade.

reasonable suspicion sufficient to prolong Martin's traffic stop.  Thus, a constitutional violation

occurred the moment that Linton detained Martin past the point that her background check came

back negative.[29]

## III.    Consent to Search

A consensual encounter may follow the end of a valid traffic stop.  *United States v.
Sanchez-Pena*, 336 F.3d 431, 442 (5th Cir. 2003) (citation omitted).  Two different standards
apply to determine whether a defendant consents to a search:  "'the normal standard for
*consensual searches that occur subsequent to legal stops*' and the heightened consent standard
that applies to a consent to search obtained after an illegal stop."  *Id*. (citation omitted).

Under the first standard, a valid consent to search must be "free and voluntary."  *Shabazz*,
993 F.2d at 438 (citation omitted).  The government typically has the burden of proving
voluntary consent by a preponderance of the evidence.  *Id*.  "The voluntariness of consent is a
question of fact to be determined on the totality of the circumstances."  *Id*.  To determine whether
consent to search was obtained voluntarily, the courts consider the following factors, (1) the
voluntariness of the defendant's custodial status; (2) the presence of coercive police tactics; (3)
the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness
of his right to refuse consent; (5) his education level and intelligence; and (6) his belief that no

---

[29]  Linton testified that he ran a search using Martin's birth name after dispatch reported
that she had no record with her married name.  Even assuming that Linton permissibly detained
Martin until this additional records search was completed, Linton did not immediately seek to
terminate the stop.  Instead, he began to complete the consent form.  While he was doing this, he
radioed Trooper Robinson for assistance.  Although the video does not reveal the exact time
when Linton began completing the consent form, it commenced at least 40 seconds before he
exited the car, because that is when he contacted Trooper Robinson.  Moreover, Linton further
extended the stop by continuing to question Martin before and while he issued her a warning.

incriminating evidence will be found.  *Id.*  Although all six factors are relevant, no single factor

is dispositive.  *Id.*

When consent to search is obtained following a Fourth Amendment violation, the consent

"may, but does not necessarily, dissipate the taint" of the constitutional transgression.  *Jones*, 234

F.3d at 242 (citation omitted).  Under these circumstances, not only must the consent be

voluntary, it also must represent "an independent act of free will" sufficient to break the "causal

chain" between the illegal detention and the consent  *Id.*  In this regard, the court must consider

"1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening

circumstances; and 3) the purpose and flagrancy of the initial misconduct."  *Id.*   Ultimately, the

consent to search cannot be the product of the illegal detention.  *Jenson, supra*.

Applying the foregoing considerations here, the undersigned finds that the government

has established neither the voluntariness of the consent, nor the requisite causal interruption.  At

the outset, the court observes that Trooper Linton had returned Martin's documents before

seeking consent to search the vehicle.  Martin also initially agreed to continue to talk with

Trooper Linton after he returned her paperwork.  This sequence supports an inference that Martin

thought that she was free to leave at the time she gave her consent to the search.  *See Santiago*,

310 F.3d at 343 (noting that whether the officer had returned driver's documentation at time

consent was obtained was relevant to voluntariness of consent).  On the other hand, Linton never

told Martin that she was free to leave.[30]  Moreover, the situation quickly changed when Linton

---

[30]  As it turns out, she was not free to leave.  At the hearing, Trooper Linton candidly
admitted that had Martin refused to consent, he would have brought in a K-9 unit.  While
Linton's subjective intent is not per se relevant to this objective inquiry, it likely colored Linton's
body language and demeanor, which could well have affected Martin's perception that any
implied freedom to depart was illusory.

asked Martin for her consent to search the car.  At that point, Martin expressed some hesitation

and inquired why Linton wanted to search her car.  Linton replied "part of my job.  I don't ask

everybody I stop.  I ask certain people, and I chose to ask you.  Is there a problem with that?"  Of

course, Linton also had just told Martin that there were good and bad people on the interstate and

inquired whether she had any illegal contraband.  Taken together, a reasonable person would

likely, and, as it turns out, correctly, infer that the investigating officer suspected her of

wrongdoing.  *See United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir.1996) ("[A] statement by

a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence

that the fourth amendment has been implicated.").  Moreover, during this discourse, Trooper

Linton repeated some earlier questions and continued to lean on the passenger door sill, with his

head in the car.  Furthermore, before Martin signed the consent form, a second trooper arrived on

scene.  Under these circumstances, the court is not persuaded that when Martin signed the

consent form, her custodial status was voluntary or free of perceivably intimidating police tactics.

Although Linton ensured that Martin read and signed a consent to search form which

stated that she had been informed that she could refuse to consent, Linton did not, in fact, explain

this portion of the form to Martin.  Furthermore, according to the video, Martin looked over the

form while standing outside of the car for approximately six seconds – but a fraction of the

approximately 20 seconds that it takes to actually read the form at a deliberate pace, in a neutral,

unpressured environment (e.g. chambers).[31]  Accordingly, the government has not established

that Martin was aware of her right to refuse consent.

The record contains no evidence regarding Martin's educational level and intelligence.

---

[31]  It is not clear whether, or for how long, Martin read the form inside of the car.

There is also no question but that Martin fully cooperated with Trooper Linton.  Finally, although Martin may have reasonably hoped that the packages of cocaine were sufficiently well hidden that officers would not uncover them during a search, the same cannot be said for the marijuana that she possessed on or about her person.  *See Jenson, supra* (defendant would have been aware of the incriminating evidence on his person).  Indeed, the marijuana was quickly discovered after Linton asked Martin to exit the car.

Upon consideration of the totality of the circumstances, the undersigned finds that Martin's consent was not voluntary.  In any event, even if Martin had voluntarily consented to the search, it remained the product of the illegal detention.  While Linton's constitutional transgression was not flagrant or egregious, he sought consent no more than one or two minutes after the unconstitutional detention.  *See United States v. Johnson*, 264 F.3d 1140, *2 (5th Cir. Jun.18, 2001) (unpubl.) (lapse of twenty or thirty minutes between the illegal conduct and the consent is characterized as a "close" temporal proximity).  Although the fact that Linton returned Martin's paperwork to her before seeking consent to search may be considered an intervening circumstance,[32] there is no indication that Martin knew, subjectively or objectively, that she was free to leave.  *See* discussion, *supra*; *see also United States v. Jackson*, 517 F. Supp.2d at 880 (no intervening circumstances where defendant was aware that he was free to leave, despite having received license back from officer).

## IV.    All Evidence Obtained As a Result of the Search Must Be Suppressed

"Under the fruit of the poisonous tree doctrine, 'all evidence derived from the . . . illegal

---

[32]  *See Jenson, supra* (detainee's knowledge that he was free to leave or if his license has been returned to him, may both constitute intervening circumstances).

search . . . must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.' " *Jenson*, 462 F.3d at 408 (quoting *Dortch*, 199 F.3d at 200-01) (ellipsis in original). "The test for determining whether evidence is inadmissible as fruit of the poisonous tree is 'whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Ward v. Dretke*, 420 F.3d 479, 488 (5th Cir. 2005) (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963)).

Here, there is no indication that the officers would have discovered the cocaine, marijuana, or valium but for their unconstitutional detention and search of defendant's car.[33] Thus, all of the physical evidence discovered as a result of the search warrant is fruit of the poisonous tree and must be suppressed. *Thibodeaux, supra* (evidence obtained as a result of an illegal seizure must be suppressed).[34]

### Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 19] filed by defendant

---

[33] Indeed, the officers did not discover the marijuana until they asked Martin to exit the car so she complete the search form.

[34] The undersigned does not lightly reach this decision, and is not unmindful of the difficult and often unheralded burden dutifully borne by law enforcement officials. However, the undersigned is also charged with the responsibility of upholding the Constitution, which sometimes includes less than optimal consequences. Nevertheless, so long as the higher courts eschew a more definitive test for reasonable suspicion in the context of extended traffic stops, the roadside determinations of law enforcement officers will continue to be subject to second-guessing by the courts. This is particularly unfortunate in this case, because it appears that Trooper Linton was well-intentioned.

Cheryl Carothers Martin be **GRANTED**, and that all physical evidence discovered in the defendant's car and person on August 6, 2009, be **SUPPRESSED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 2nd day of December 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE